CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

June 17, 2026

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **MARCUS C. INGRAM,** | ) | |
| **Plaintiff,** | ) | **CASE NO. 7:24-cv-00138** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **ISRAEL HAMILTON, et al.,** | ) | **By:  Robert S. Ballou** |
| **Defendants.** | ) | **United States District Judge** |

Marcus Ingram, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983, alleging that the Defendants failed to protect him against an assault by another inmate in violation of the Eighth Amendment and that the Defendants were negligent pursuant to Virginia law.  He is seeking "$2.5 million [in] compensatory damages [and] $500,000 [in] punitive damages" from each defendant.  Dkt. 1. Defendants Hamilton, Whaley, and Coleman have filed a Motion for Summary Judgment under Federal Rules of Civil Procedure Rule 56.  Dkt. 32.  Plaintiff filed a Motion for Discovery to Oppose a Summary Judgment and submitted his Memorandum in Support of Plaintiff's Motion to Dismiss Defendants Motion for Summary Judgment together with the Discovery Motion.  Dkt. 35.  For the reasons set forth below, I grant the Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Discovery.

## I.    RELEVANT FACTS

*Facts leading up to March 3, 2023 incident*

Ingram alleges the following sequence of events on which he bases his § 1983 claims. On November 2, 2022, Ingram was transferred to Keen Mountain Correctional Center and initially placed in the Restorative Housing Unit. He was released from Restorative Housing, placed into the general population on December 7, 2022, and assigned to a cell with inmate David Finney.  Ingram states that he "learned that Finney suffered from mental health issues and

that he was on medication and seeing a psychiatrist for his problems." Dkt. 1. According to Ingram, Finney's prior cellmate "had checked into the [Restorative Housing Unit] because he feared for his safety in the cell with Finney." *Id*. Ingram does not allege that Finney's prior cellmate was either threatened or harmed in any way while sharing a cell with Finney.

In late December 2022 or early January 2023, Ingram began to observe what he characterized as odd behavior from Finney, including "sit[ting] up in his chair all night, fully dressed with his coat on, writing on napkins and torn paper and anything else he could find and at times he would nod to sleep and the officer doing rounds would tap the door to make sure he was alive." *Id*. Ingram began losing sleep during this time because he feared what Finney would do and continued to watch Finney's odd behavior for several days until he started seeing "encrypted messages written on the cell wall when [Ingram] would come into the cell." *Id*. Ingram does not allege he spoke to anyone about his concerns or filed a grievance concerning Finney.

At some point, Ingram noticed that Finney stopped showering and also began working out in the cell, which caused the cell to "smell[] awful." *Id*. On January 7, 2023, Ingram learned that inmate J. Darden was losing his cellmate and spoke to him about sharing his cell. Ingram had previously shared a cell with Darden at another facility and wanted to move away from Finney. Darden spoke to Lieutenant Coleman about Ingram switching cells and obtained a cell change request form for Ingram. Ingram claims that when he turned his form into Defendant Coleman, he "asked … [Coleman to] expedite the move because [Ingram's] cellmate had started to act weird and had written encrypted messages all over the cell wall and [Ingram] did not feel comfortable in the cell with [Finney] anymore." *Id*. Ingram further alleges that he "told Coleman that Finney was mental health and that he had not been going to pill call to get his meds

2

for a few days." *Id*. Defendant Coleman took the form and stated "[i]t is a process and [Ingram has] to be patient." *Id*. Ingram did not file a grievance or complaint following the conversation with Coleman.

At some point in January, Ingram asked Defendant Coleman "why everyone else was being moved but [Ingram]," to which Defendant Coleman responded "[l]isten, I told you it is a process and if you can't be patient then I don't know what to tell you." *Id*. Ingram claims that Defendant Coleman was wearing a body camera. Ingram asserts he stated to Defendant Coleman "I have been patient but when I am seeing everyone else around me getting to move and I'm not being allowed to and I have told you multiple times that my cellmate is behaving weird and writing all types of weird stuff on the wall, what do you expect me to do." *Id*. Defendant Coleman asked Ingram for his cell number and excited the cellblock. Thereafter, no one came to investigate, and Ingram continued to wait for a cell change. Per Ingram's complaint, following the two interactions with Coleman in January, Ingram does not speak to anyone again about Finney's behavior until the March 3 incident, nor is there any indication that Ingram ever filed a grievance before March 3.

*March 3, 2023 incident*

On March 3, 2023, booth officer, Officer Keen, announced a lockdown for count, and all inmates in the cellblock returned to their assigned cells. Ingram found that he could not enter his cell because Finney "had the door blocked with a chair with a sheet draped over the back of it and Officer Keen closed all cell doors leaving Ingram standing on the tier at his door." *Id*. Once Officer Keen re-opened the cell doors, Ingram attempted to enter his cell and "stepped in something slippery in the threshold of the cell." *Id*. Ingram glanced down to see what he had stepped in and observed a mixture of baby powder, hair grease and shampoo. Ingram asked

3

Finney why he poured the substances on the floor and Finney called Ingram "a stupid bitch and

… threw a cup of … cleaning chemicals in [Ingram's] face instantly burning [his] eyes." *Id*.

Ingram wiped his right eye enough to see Finney swing something white at his face, hitting his

hand.  Ingram realized that he had just been hit with a lock in a sock and immediately ran out of

his cell, screaming for help while being pursued and "struck in [the] head repeatedly" by Finney.

*Id*.  "It wasn't until [Ingram] ran past 12 cells, was beaten a total of 18 seconds, struck 10 times

in the head and collapsed in front of the cellblock control booth … before Inmate Finney turned,

walked back down the tier laughing like a mad man, threw the lock and sock in a trash can by the

steps, and then officers responded from all over the compound, cuffed Finney and took him

away." *Id*.  Among others, Defendant Coleman was one of the officers who responded to the

incident.  Following the assault, Ingram was taken to the hospital and treated.  He received 10

staples to his head and is "now being treated for migraine headaches," has to take medications

twice a day, and is working with a doctor to treat his "post stress distress." *Id*.

*Facts following March 3, 2023 incident*

On March 8, 2023, Ingram was "confronted by the Warden Hamilton and 3 of [Warden

Hamilton's] ranking officers." *Id*.  During the meeting, Ingram observed his cell change request

form with a written note "not compatible," which he was informed of that day. *Id.* Ingram claims

that had he known that he and Darden were not compatible, he would have found a different

cellmate.

On March 17, 2023, Ingram alleges that Defendant Coleman personally escorted him to

an "'intimidation' meeting[]' … [at] the Chief of Securitys [sic] office, Mark S.K. Whaley,"

where Ingram "was confronted by a room full of officers." *Id*.  Ingram alleges that Defendant

Whaley asked Ingram "why [Ingram] turned in a written complaint [against Defendant Whaley]"

regarding where Defendant Whaley's officers "should have been posted." *Id*. According to

Ingram, Virginia Department of Corrections (VADOC) policy requires the presence of a second

officer during lockdown, which did not occur on the day of the assault.

At the "intimidation meeting" with Defendant Whaley and other officers, Defendant

Whaley stated that "he does not know why there was not an officer on that floor but he is

investigating it." *Id.* However, Ingram alleges that he "never heard anything back from

[Defendant] Whaley and this is one of the many written complaints on this incident that [Ingram]

never received a receipt for." *Id.* Ingram also alleges that he "tried to get a grievance processed

on [the assault] but the grievance coordinator, Ms. Harr, does not like inmates that write up

officers and don't [sic] process those complaints that hold validity which is why the complaint

that [Ingram] wrote to Mr. Whaley went straight to Whaley without going into the VADOC

system." *Id.* Ms. Harr is not a named defendant.

Ingram goes on to explain that there are two weapons in each control booth in the prison

with non-lethal ammunition, designed to be used "in situations to regain control and [Ingram]

was told by [a] retired VADOC relative that the weapon was also supposed to be used to stop the

attack on [Ingram] as long as firing didn't pose a threat to anyone else." *Id.* Ingram "filed a

complaint and exhausted all other remedies trying to get answers why [Ingram] was not

protected better and [Ingram] got a response on the written complaint stating the booth officer

Keen did not have time to remove the weapon, get it out the window, and fire it within the time

elapsed in the attack." *Id*. Officer Keen is not a named defendant in Ingram's action.

Defendants' Hamilton, Whaley and Coleman have filed a Motion for Summary

Judgment. In his affidavit, Coleman asserts he "recalls that Ingram gave [Coleman] a request

form stating that he wanted to move cells … [but] do[es] not recall Ingram expressing that he

feared Finney or had other concerns with Finney." Dkt. 33. Ingram alleges that because Finney

has a "very violent criminal record" and a "very violent institutional record," that the Defendants

should have realized that Finney was a threat to Ingram's safety. Dkt. 1

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary

judgment "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." A movant is entitled to summary judgment

only if the record as a whole *could not* lead a rational trier of fact to find in favor of the non-

movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).[1] On the other hand, where the

ultimate factual conclusions to be drawn are in dispute, summary judgment is not appropriate.

*Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve

disputed facts, weigh the evidence, or make determinations of credibility at the summary

judgment stage. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995).

In considering a motion for summary judgment under Rule 56, a court must draw all

reasonable inferences in the light most favorable to the nonmoving party. *Jacobs v. N.C. Admin.

Off. Of the Cts.*, 780 F.3d 565 n.1 (4th Cir. 2015). The court "scrutinizes" each party's case "to

determine whether the [party] has proffered sufficient proof, in the form of admissible evidence,

that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d

1310, 1315-16 (4th Cir. 1993). A nonmovant, to defeat a motion for summary judgment

supported by affidavits, "may not rest upon the mere allegations or denials of his pleading, but

must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986). Detailed factual allegations in a verified, *pro se*

---

[1] The court has omitted internal quotation marks, alterations, or citations here and throughout
this opinion, unless otherwise noted.

complaint, if based on personal knowledge, may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams*, 952 F.2d at 823.

Ingram cannot defeat the Defendants' properly supported summary judgment motion, however, with mere groundless generalizations or speculation. *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) ("Mere speculation by the non-moving party cannot create a genuine issue of material fact."). A plaintiff cannot use a response to a motion for summary judgment to amend or correct the complaint challenged by the motion for summary judgment. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).

## III.    DISCUSSION

### A.  Failure to protect

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. . . ." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Eighth Amendment's prohibition on cruel and unusual punishment imposes a duty on prison officials to take "reasonable measures to guarantee the safety of the inmates," a duty that includes "protect[ing] prisoners from violence at the hands of other prisoners." *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). A claim of deliberate indifference has an objective and subjective element. *Farmer*, 511 U.S. at 834–37; *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022). "The objective prong requires the inmate to demonstrate a 'substantial risk of serious harm.' *King v. Riley*, 76 F.4th 259, 264 (4th Cir. 2023) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994). The Defendants acknowledge that Ingram's injuries sustained in the altercation on March 3, 2023, were sufficiently serious to satisfy the first, objective prong of this standard.

Turning now to the subjective element of deliberate indifference, Ingram is not required to show that the Defendants acted or failed to act with the purpose of causing harm or even with knowledge that harm would result. *Farmer*, 511 U.S. at 835. To survive summary judgment, Ingram "need only proffer sufficient evidence from which a reasonable jury could find that the Officers acted with deliberate indifference." *Case v. Beasley*, 167 F.4th 651, 660 (4th Cir. 2026). Specifically, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Ingram "must show that genuine issues of material fact remain as to whether the Officers subjectively knew of 'a substantial risk of serious harm" but "disregard[ed] that risk by failing to take reasonable measures to abate it.' *Farmer*, 511 U.S. at 847; *see also Cox*, 828 F.3d at 236. "That means, even with knowledge of the risk, an official who 'responded reasonably to the risk' cannot be found liable under the Eighth Amendment." *King v. Riley*, 76 F.4th 259, 264 (4th Cir. 2023) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)). I conclude that Ingram has not met his burden.

### 1. Knowledge of the Risk

A prison official's subjective actual knowledge can be proven through circumstantial evidence showing, for example, that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer,* 511 U.S. at 842 (quotation marks omitted). Direct evidence of actual knowledge is not required. *See id.* at 842-43.

The record is completely devoid of facts that indicate any of the Defendants were aware of any risk, let alone knew of the substantial risk of harm. First, Ingram alleges that Finney's

prior cellmate entered Restorative Housing because he "feared for his safety in the cell with Finney," but there is no indication that any of the Defendants personally knew that information, nor that there was a wide-spread fear of Finney among other inmates or prison staff.  Dkt 1. Furthermore, there is no indication that Finney ever injured anyone, either his prior cellmate or any other inmate while being housed at Keen prior to the March 3 incident.  Ingram also never indicates that he told Coleman or any of the other Defendants that Finney's prior cellmate entered Restorative Housing because he "feared for his safety."  *Id*.  Ingram instead alleges that the Defendants should have known of the risk to Ingram's safety based solely on Finney's mental health status, his odd behavior, his violent criminal and institutional records, and the possibility that he was not taking his medications as prescribed.  However, Ingram fails to provide sufficient facts that would indicate that any of the Defendants knew any of the information he now alleges in hindsight.  Furthermore, Ingram cannot rely on pure speculation, conclusory statements and generalizations.

Next, Ingram claims that he spoke to Coleman "multiple times" regarding Ingram's observations about Finney's behavior.  *Id*.  However, Ingram's allegations mention only two interactions he personally had with Coleman – one when he turned in his cell change request form and another when he complained that "everyone else around [Ingram is] getting to move and [Ingram] is not being allowed."  *Id*.  When he turned in his cell change request form, Ingram alleges he asked Coleman to expedite the move because Finney "had started to act weird and had written encrypted messages all over the cell wall and that [Ingram] did not feel comfortable in the cell with [Finney] anymore."  *Id*.  Ingram further alleges that he told Coleman that "Finney was mental health and that he had not been going to pill call to get his meds for a few days."  *Id*. Ingram does not state a specific fear or allege that Finney has threatened him in any way.  At

9

most, Ingram alleges that Finney is making him uncomfortable.  The second interaction with Coleman occurred after Ingram notes several moves of inmates who had supposedly turned in their cell request change form after Ingram.  According to Ingram, both of these interactions with Coleman occurred in January.  The attack occurred in March.  Per Ingram's complaint, January was the last interaction he had with Coleman about Finney until the attack in March.  Ingram does not allege that he spoke to anyone else about Finney or that he continued to push for the move.  Furthermore, there is no indication that Ingram filed a grievance or formal complaint until after the incident.  *Cf. Makdessi v. Fields*, 789 F.3d 126 (2015) with *King v. Riley*, 76 F.4th 259 (4th Cir. 2023) and *Case v. Beasley*, 167 F.4th 651 (4th Cir. 2026).

Moreover, when Ingram turned in his cell change request form to Coleman, on the form, he stated "more compatible" as his reason for the move.  Dkt. 1.  Ingram does not allege he stated having a fear of Finney or that he feared what Finney would do, that Finney was a threat or Finney had even threatened Ingram.  Nor does Ingram state that he explained Finney's odd behavior or that Finney had allegedly stopped taking his meds; only that Ingram believed he was more compatible with Darden.  Ingram claims he requested that Coleman expedite his request because Finney "is behaving weird and writing all types of weird stuff on the wall."  *Id*. Ingram's conclusory statements, baseless generalizations, and bald assertions about Finney's behavior without more are not enough to put anyone on notice of fear or fear of attack or even a potential threat to safety.  Just because someone is behaving strangely and suffers from a mental illness does not mean that person is dangerous, nor does it put anyone on notice that an attack will occur.

Ingram also argues that Darden allegedly told Coleman about Finney's odd behavior. However, there is no indication that Ingram went with Darden to speak with Coleman directly

10

and obtain a cell change request form or that Darden explicitly stated to Coleman that Ingram feared Finney.  Furthermore, there is no indication that Ingram ever expressed what he claims now as his fear of Finney to Darden.

There is also no indication that any of the defendants knew of Finney's "very violent criminal record" or Finney's "very violent institutional record," *Id*., since none of the defendants were involved in the initial cellmate assignment.  Dkt. 33.  Ingram presents no information about documentation regarding Finney's violent behavior; only generalizations, speculations, and conclusions about Finney.  Nor does Ingram mention any longstanding, pervasive inmate-on-inmate violence within the prison to put any of the Defendants on notice of potential harm. Prisons, because of their intended purpose, are dangerous places, but "not every injury suffered by a prisoner at the hands of another 'translates into constitutional liability for prison officials responsible for the victim's safety.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)).

Ingram alleges that if the defendants, Coleman in particular, had investigated the claims that Ingram made, Coleman would have realized that Ingram was in danger of Finney.  Ingram's premise is largely based on his belief that a mental health issue equates to a violent person or personality, and the defendants should have foreseen that.  However, not even Ingram himself foresaw that outcome.  Additionally, Ingram did not file any grievances and complaints until after the incident and Ingram only complained to Coleman generally about Finney's behavior. The vague descriptions of Ingram's concerns about Finney's behavior did not provide officials with sufficient information to know of a substantial risk or threat to Ingram's safety.

Ingram alleges he began complaining about Finney's behavior to Coleman in January and that after only two face to face interactions with Coleman in mid-to-late January, Ingram waited

11

to be moved and have the issue addressed.  By Ingram's own admission, nearly six weeks passed between the time that Ingram complained to Coleman, and Finney attacked Ingram.  There is no indication that Ingram ever spoke to any of the defendants, that he pressed Coleman to investigate, that he ever indicated that Finney was a danger or that he spoke to others about Finney and how fearful he was of Finney.

Lastly, a substantial portion of Ingram's complaint revolve around the alleged negligence of the Defendants failing to follow VADOC security operation procedure, which states "[w]henever the doors of the cellblock are accessed for movement on a security level 4 or higher facility, there should be an officer on the floor at all times."  Dkt. 1.  Ingram claims that had the procedure been followed, the attack would not have occurred.  However, the outcome is still the same because Ingram has failed to allege that any of the Defendants knew of any risk posed by Finney or that Ingram had a specified fear of Finney and had communicated that to the Defendants.  "[K]nowingly violating a prison policy does not amount to deliberate indifference." *King*, 76 F.4th at 267.

While no one disagrees that Ingram's injuries were serious, Ingram's allegations simply fail to show that any of the defendants knew of that risk *and* disregarded it, resulting in an Eighth Amendment violation.

## B.  Negligence

It is well settled that the Eleventh Amendment generally bars suits brought by a citizen against his own state.  *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 107 n.12 (4th Cir. 2011) (citing other cases).  Thus, "nonconsenting States may not be sued by private individuals in federal court," unless the state has waived immunity.  *Bd. of Trs. v. Garrett*, 531 U.S. 356, 363 (2001).  Although the Commonwealth enacted the Virginia Tort Claims Act (VTCA) and

allowed itself to be sued for negligence claims filed in state courts, it has not waived its Eleventh

Amendment immunity and has not consented to be sued for negligence claims in federal courts.

*McConnell v. Adams*, 829 F.2d 1319, 1329 (4th Cir. 1987); *Creed v. Virginia*, 596 F. Supp. 2d

930, 938 (E.D. Va. 2009).  Under the plain language of the VTCA, such claims may only be

maintained against the Commonwealth, not against individual state officers like the defendants.

*See* Va. Code Ann. § 8.01-195.3.

Ingram appears to assert claims of negligence under the VTCA against Hamilton,

Whaley, and Coleman.  Ingram alleges that Coleman negligently failed to investigate the odd

behavior of Inmate Finney, which eventually led to his injury, and that Hamilton and Whaley

negligently failed to supervise the number of correctional officers assigned to the cellblock

during lockdown.  Ingram further alleges that Defendants Hamilton and Whaley negligently

allowed subordinates to violate prison policy.  Because Ingram may not maintain negligence

claims against individual officials under the VTCA, the court will grant the Defendants'

Summary Judgment Motion as to such claims.

## IV.    INGRAM'S DISCOVERY MOTION

Ingram filed his complaint on February 22, 2024, and following service, Defendants'

filed an answer on June 27, 2024.  Since June 27, 2024, Ingram has had the opportunity to

request and receive discovery (Dkt. 20, 21, 23, 24, and 25).  On January 23, 2025, Ingram filed a

motion to issue a subpoena for the release of 11 still photos and cell block video footage.  Dkt.

20.  On January 23, 2025, Judge Sargent entered an order granting Ingram's request.  Dkt. 21.

On July 7, 2025, Ingram filed a motion to compel the defendants to turn over the photos that had

not yet been sent and "issue [Ingram] a copy of the video footage" so that it could be forwarded

to Ingram's attorney.  Dkt. 23.  On July 9, 2025, this Court ordered the Defendants to place a

copy of all relevant video evidence and photographs on file with the penal institution currently housing Ingram. Dkt. 24. On July 23, 2025, the Defendants' filed their response with the Court certifying that the requested discovery had been sent to Ingram, which included body camera footage from March 3, 2023. Dkt. 25.

Ingram now requests "all body worn camera footage of Lt. S. Coleman for the months of December, January, February 2023 to show the interactions with Plaintiff Ingram are true and correct … and that Lt. Coleman is being dishonest." Dkt. 35. Defendants have already produced body camera footage and photos from the March 3 incident. Plaintiff filed his Motion for Discovery as a request to defend a Motion for Summary Judgment. The Court construes his motion as a Motion for Discovery pursuant to Federal Rules of Civil Procedure Rule 26 and Rule 56(d). Rule 26(b)(1) states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery to resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Ingram has had since June 2024 to engage in discovery. Trial is set for July 8, 2026, with all discovery sent to corresponding parties by June 8, 2026. Defendants have produced body camera footage from the March 3, 2023 incident. At this stage of the case, requesting all body worn camera footage from Lt. Coleman for the months of December 2022, January 2023 and February 2023 to prove that Lt. Coleman is "being dishonest" is not only irrelevant to Ingram's claims, but the burden on the Defendants to produce three months of body camera footage when Ingram's complaint only mentions two interactions with Coleman sometime in January is clearly

14

outweighed by any potential benefit and appears to be more of a fishing expedition.  It is also highly unlikely that the footage even still exists nearly three years after the alleged conversations between Ingram and Coleman.  Even if the footage did exist, Ingram has failed to show that the discovery he seeks would be sufficient to overcome the Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure Rule 56(d).  Accordingly, Ingram's Motion for Discovery is denied.

## V.    CONCLUSION

For the reasons stated, the court concludes that the Defendants' Summary Judgment Motion is granted and the Plaintiff's Motion for Discovery is denied.  A separate order will be entered.

The clerk will send a copy of this memorandum opinion and the accompanying order to the plaintiff and to counsel of record for the defendants.

Enter:  June 16, 2026

*/s/ Robert S. Ballou*

Robert S. Ballou
United States District Judge

15